I apologize, Your Honor, I didn't mean to blindside you with the clerk reference, the clerk's record reference, that last case. Now, I think, as you noted in your 28-J letter, the primary substantive issue in this case is under consideration by another panel, right? It is, Your Honor, and I wanted to bring that to your attention. So, I don't know, I guess we'll see what they do, but why don't you tell us about the, there's an issue here about standing, right? There is, Your Honor. The issues that are being considered by the Pasadena panel involves secondary, are secondary issues that, oh, once again, Scott Hubbard, allow me to reintroduce myself, I represent the plaintiff. This case is the flip side to the one before, where the first case dealt with injury, in fact, this one deals with threat of future injury. Once again, I think that the authority or the case law is pretty specific on that one, especially with Dorn and Chapman. So, unless the... I have a question on that. Fair enough. Would you lay out for me his specific plan to return to get you beyond speculation? What should I be looking at? His specific plan to return involved, well, let me ask clarification. Are you referring to his specific plan to return to the city of Stockton? Well, we have... No, we're talking about Sears. No, we're both. Stockton and then the preference for Sears. Fair enough. Based on Dorn, you don't have to have, there are certain places that you don't have... I've got the law under control. Why don't you tell me the facts that support the two prongs under DeLille? Fair enough. Under DeLille. Well, under all these cases about what, you know, tell me what are the facts that you're relying on? Fair enough, Your Honor. Larry Fieser is a paraplegic. He is a veteran. He gets his medical care at the Palo Alto VA Hospital. Stockton is halfway between the Palo Alto Hospital to his house. He stops in Stockton. He doesn't make the entire drive there because it's a bit of a burden for him. He stops off at the Palo Alto, or excuse me, at Stockton, spend the night before driving in. He has friends there. He shops there. He has, much like other disabled people, he has a large, I won't say a large number, he has multiple physical problems, including one leg that was amputated, but at the time of this record he was talking about it in the future. It has since been amputated. That requires trips to the VA hospital in Palo Alto. He was having stomach problems, if memory serves. I'd have to double-check that. Again, VA hospital in Palo Alto. He has rotator problems because he uses a manual wheelchair. Again, his rotator cuffs are wearing out. He can't do that anymore. Palo Alto Hospital, VA hospital in Palo Alto. Every time he goes there, he stops off at Stockton because it's a shorter drive, he has friends there, and it's where he likes to be. Now, that's it in a nutshell with respect to returning to the city of Stockton. With respect to returning to Sears, he has visited Sears in the past. This particular trip that got his blood going was the bench, which brings us to the secondary issue. Let's stick to it. Standing, yes, Your Honor. Because what he was never asked in the deposition was about his preferences in shopping at Sears. I don't see that being asked. Unless I missed something, and if I did, then you can tell me where I should look for it. I don't know if that particular question was asked, and I want to be accurate. Well, you know, you're here to get standing before we can go to the second issue, and so that seems fairly significant and important. And that's what I'm concerned about is what's missing here about Sears. I'm not entirely certain, Your Honor, and this is where I'm going to have to go into the legal aspect. I'm not entirely certain preference to shopping at a particular place or a particular facility is a prerequisite for standing. Well, he can't. If all he's going to say is I'm going to go to Stockton, that's enough? You think that's enough? I do. What's your best case for that? Doran. Doran v. 7-Eleven, where they, if you read both the defense's briefs in that case, 7-Eleven's briefs in that case, and the party's motion for an in-bank. Well, no, I'm not sure about that. 7-Eleven went ho-hog to argue that there was no definite plans to return to that particular store. And so the Ninth Circuit panel said that no, you just have to get to the city because people don't have definite plans to go to Sears. They don't have definite plans to go to 7-Eleven. It's just someplace you wind up. It's like Denny's. No one intends to go out to Denny's. You just wind up there. So Sears, I think, probably qualifies a lot of fast food in retail establishments. Right. But let's talk about the record here. He was there once, April 7, 2010. That's it, right? He has said in his statement. He might have been there some other time he couldn't remember. The only time we know he was there for sure was one date, April 7, 2010, correct? No. The only date that he remembered for sure was that date. But he had testified that he had been there numerous times before. I don't think that's what he said. You know what? I try and be accurate. Let me pull that back because I believe I cut and pasted his testimony. Well, let's go to his future plans. Here's what his deposition testimony is. Do you have any plans to visit the Sears store again? Yes, I'll go back. Absolutely. Do you have any distinct plans to visit this Sears store as you sit here today? Like a specific date, ma'am? Yes. No, ma'am. And then he says at some other point that his policy is never to go back to a store unless it's compliant. True? You know, people should never say never. But I believe that he said that he was deterred from going back there again. But it's hard to put in context because Sears is a large store. But he might. Well, here's what he said in his deposition concerning his prior visits. The question, besides April 6 or 7, have you been to the Sears store on any other day? I'm sure I did if I went to the mall. I mean, we don't know whether he didn't say yes. All right. I'm pulling up the record. I believe, if memory serves, in the excerpts of record. And then prior to that, the question is asked, have you ever been to the Weberstown Mall before? On maybe a few occasions. When was the last occasion? On a few occasions. I'm not sure this last occasion or there might have been one other occasion. My prior visit on this date. I was afraid that I could. I do know, I know for a fact that he testified that he had been to this particular store on multiple occasions. I don't have a citation for the record of that. So on that, I do apologize. Well, isn't that the kind of key point, his intent to return? No, it's not. And I have two minutes, and obviously I'd like to save some time for rebuttal. But if I could just answer that. Past visits deal with damages. Future likelihood of return does not generally hinge on past patronage. This is a big deal for the Department of Justice. In Steger, in Chapman, they all said the same thing. Right. I mean, you can't get damages. So let's assume for a fact he's never been to this Sears store. But he had knowledge of the barriers anyway. He would still have standing to pursue them. Not under Chapman. He would under Dorn. I'm trying to remember the language in Chapman. Intent to return. Well, no, that goes without saying on all injunctive relief cases. You're absolutely right on that one. So I have a minute. I'd like to save the rest for. Okay. Good morning, Your Honors. David Raisman for Sears Roebuck and Company. If it pleases the Court, I'll, excuse me, I'm recovering from a cold, start with that last point. The Supreme Court in Lyons recognized that past wrongs bear on whether real and immediate threats of future injury occur. Chapman also looked at the issue. It didn't decide it was dispositive, but noted his frequent past visits and that this was near his favorite restaurant. So it's absolutely appropriate to look at the past as a means of discerning the future. I want to note, just moving backwards for a second, appellant just made the point that this is really about the real and immediate threat of injury prong of the standing test, and it is that. But it's also part of the injury in fact prong, given the fact that we don't believe that any of the barriers here, as the plaintiff testified about them, actually created any injury in fact. But I'm going to focus today on the real and immediate threat, unless the panel has questions about that. The panel in questioning appellant has focused on a number of the arguments. I can see I'm loud enough without this. But I wanted to point out one that I wish I had noticed at the oral argument and that I wish the district court had noticed, and that Judge Thomas may have been alluding to earlier. Not just at the time of his deposition, almost nine months later, a full nine months after his alleged visit, had he not been back to the Sears store, Stockton, or the mall. But by the time he gave the declaration on January 27, 2012, which was now more than a year later, almost 22 months after his alleged visit, he's free to write whatever he wants in the declaration. That's true, of course. He makes no mention in that declaration in opposition to summary judgment of any visits in that entire interim. The courts have made clear, starting with Lou Jan most significantly, that the mere professed intent, which is exactly what we have here, it's as mere as it can be, the professed intent to return to Sears, let alone Stockton or this mall, is not enough. And that's what we have here with respect to the real and immediate threat of future injury. There's the other factors that have been discussed. They haven't been discussed this morning about how far he lives away. There are a number of mentions about recent medical events that are nowhere in the record. His stomach problems, his amputation, his rotator cuff, nothing anywhere about the frequency of visits to Palo Alto, let alone Stockton. Anywhere in the record, other than that he's going to need treatment. Again, at some unstated time. In my view, this falls well within the idea of someday intentions that the court in Lou Jan was expressly critical of to provide standing. I want to also point out, in connection with the standing, and to the extent he tries to claim there's deterrence, which is made ambiguous by the fact that he both claims he's deterred every day until they fix it and that he intends to return. I'm not sure which of these pieces of evidence to run with, Your Honors. He can't salvage his standing case or his real and immediate threat of injury by reference to standing here. In his deposition, he testified that he was deterred no specific day or every day until it changes. That provides us no clue as to what was actually deterring him. We look to his declaration. There he says what deterred him in paragraph 7 of his declaration. That's at page 17 of the excerpts. He outlines there what posed the problems to him. None of these is a barrier, and we know from Chapman if it's not a barrier, it can't act as a deterrent. One is that there is no clear space at the end of the bench. That was not a requirement under either of the codes in force at the time, which is recognized implicitly in his experts' report or the experts' declaration preceding the report, where he does not identify either of these as issues. And both of those sections are in the report at 28 and 29, and one can see very clearly there's no reference to clear floor space at the end of the bench under those codes. The other thing he mentions in paragraph 7 of his declaration in opposition to this motion is when the mirror is more than 10 foot away, 10 feet away, it presents a problem to him. As an aside and for the record, his expert at page 20 of the excerpts measures this at 126 inches away, which is 10 feet and 6 inches. Now, with respect to the mirror and this other factor that apparently bothered him when he visited the store, there's no requirement here. There's no requirement about the distance that a mirror needs to be. We think it's plain from the photograph and the expert's own report that one can have a view of oneself seated at the bench. That's exactly what the expert's doing. So we have evidence right there. And there's no evidence anywhere that a mirror has to be a particular distance away. Even the appellant's argument here is that it has to be 10 feet. His own standard, not the Justice Department's standard, his own standard, is a mere 6 inches off here. I think it's important to point out something from Chapman that came up a little bit in the prior case, and that is that Chapman relies on ADAG and the standards that are stated there and the standards that aren't stated there. It says there that ADAG removes the risk of vexatious litigation that a more subjective test would create. By arguing that a mirror is too far away, that's exactly incorporating the kind of subjective standard that ADAG and Chapman are designed to discredit. With respect to the substantive issues, Your Honor, I just got the 28J letter on Sunday evening. I don't know any of those citations. They're not citations to authority, which is what 28J allows. But nevertheless, I understand the Court may be interested that another panel is reviewing this issue. Well, under rules of priority, if it's submitted to them first, then we have to defer to their decision. That's the relevance of that. I understand. And our arguments are online video, so you can watch them. Just last week in Pasadena, I think. I don't doubt that it's all true, Your Honors. I just can't comment. But you want to make your argument, too, so go ahead. I want to have a chance to review that and understand its pertinence. There is no decision. There aren't any decisions in those cases yet. The only question is whether we ought to wait for those panels to act. And if they issued a published opinion, we would have to follow it. If they didn't, we would not. So if you want to argue the merits, go ahead. Understood, Your Honor. With respect to that issue, and I assume we're talking about the bench length, it's clear that in his declaration, he does not complain about the bench length. He mentions the bench length, but he doesn't talk about the bench length presenting any difficulties to him. And the declaration is very short. This is on page 17 in paragraph 4, where he talks about the difficulties he has with the bench, and the only thing he mentions is he can't do a diagonal transfer, which is something that's allowed by having space at the end of the bench, not relevant to bench length per se. We've now, in passing, covered virtually all the barriers alleged in this complaint, and that leads to our second independent basis for why this case should, the district court's ruling should be affirmed here, and that is that there are no barriers in the Sears fitting room. He had, by the time of summary judgment, already withdrawn, as he should have, and never made the allegation that the bench was too high, that it was 18 inches, and that's undisputed, and that was withdrawn. I've already mentioned the mirror issue and the distance of the mirror. We've also mentioned the space at the end of the bench, which was not a relevant requirement at the time. The only thing we're left with is this notion that a bench must be a specific dimension, and given that another panel's addressing it, Your Honor, I just make a few brief arguments in the time that's remaining to me, and that is that the new requirement under the ADAS, the ADA standards, has converted to a minimum standard of 42 inches, thus recognizing perhaps the ambiguity in the prior rule and understanding that it's the minimum that matters, it's not the nothing, going back to injury in fact, that indicates that the appellant had any difficulty with the length of the bench per se. With respect to that, if we were to be ordered to fix this bench, Your Honors, it would put us to the preposterous task of shortening the bench in order to make it comply with a rule that no longer applies. In other words, the bench length, as it sits today, complies with the rule that the district court would order us to follow, and there'd be little or no sense in making us do that. Thank you, Your Honors. Thank you. I tried bird-dogging the sections that I remembered on the number of visits and how he stops by whenever he goes to the Webbertown Mall, how he goes to the Sears store, and I couldn't find it, so I do apologize for that. Opposing counsel is correct. The bench length is the length it would have to be under the 2010 standards. However, if they go that route, then they're going to have to add a 42-inch bench, too. The easier for them to comply by adding a 42-inch bench and complying with the 91 standards than it would be to comply with the 2010, although under the DOJ regs they'd be required to comply with the 2010 regs. That's all I have. Is there any other questions? I think not. Thank you.
judges: Thomas, Tashima, McKeown